Parker C. J.
A majority of the Court are of opinion, that the case reported shows competent facts from which the jury might lawfully infer, that the note m suit was given upon a corrupt and usurious bargain for the loan of money. It was a stronger case perhaps of gross fraud and imposition, but still the same facts are consistent with a usurious bargain, and the Court cannot, but by an exercise of power which does not belong to them, set aside a verdict thus obtained.
[His Honor here went into an examination of the facts.]
*159 Now there can be no doubt but that this was a gross cheat, and whether it is in the form of usury or fraud would be of little consequence, if Learned was the plaintiff. It is of importance, however, in the present action, if there is any difference in the effect of these facts upon the note when sued by an indorsee ; and as the jury have put their verdict upon the ground of usury, there must be legal evidence to support that ground. And if the direction, which is not complained of, is right in point of law, we think diere is sufficient evidence to justify the verdict.
A loan of money was the thing desired by the deceased, and money was lent and security taken for it. But a great part of the consideration of the note and mortgage consisted of the two promissory notes of Whitney and Goddard, which, from all the testimony, were worth but little, and, according to some of it, were worth nothing. Now the objection is, that these notes must be considered as sold, and not as thrown in to swell the debt of the deceased in the shape of compensation for the money lent. The law does not seem to be denied, that if the agreement was for borrowing and lending money, and these notes were imposed upon the deceased as the condition upon which alone he should be accommodated with a loan, such a transaction would constitute a usurious bargain. It is certainly not necessary that any particular rate of interest should be agreed upon, to satisfy the statute. If a man lends 100 dollars, and takes a note for 300, it may be extortion or imposition, but it is not the less usury, provided a lending was the basis of the contract; and when goods or debts are thrown in, at a price beyond their value, for the same object and purpose, the effect is the same. Nor will it be supposed, that it is necessary to prove an express agreement between the parties to pay, for the use of money, more than the lawful rate of interest, to constitute usury. Such an agreement may be inferred from the acts of the parties. Now I see not why the jury had not a right to infer, as they did, from the circumstances attending this transaction—the urgency to obtain a loan, the private conference between the parties, the condition and value of the notes taken, and the advance of *160 money, with the security, taken for it—that there was an agreement to lend, on the part of Learned, and to borrow, on the part of the deceased ; and that advantage was taken of the necessities of the latter by the former, to procure a note for a much larger sum than was lent, and that to cover and conceal this, to avoid the statute, the device of the bad notes was resorted to. Much stress was laid, in the argument, upon the enormity of the usury, if any, in order to show that there could have been no such agreement, and that the transaction was oppressive and fraudulent, rather than usurious ; but this certainly would not be the first in stance of gross usury, and even fraud, in a usurious bargain. If a man borrow 100 dollars for a year and agree to pay 200 for it, he being poor, in debt, an officer being in his house and his furniture attached, this would be a gross act of oppression, but the note might nevertheless be avoided for usury ; and if the sum for compensation were much larger, the character of the transaction would not be changed. So that the only question would be, was there an agreement to borrow and lend; and such an agreement may be inferred, if not directly proved.
This case resembles exceedingly one which is reported in Douglas, 736, (Lowe v. Waller,) in which a man, who was pressed for money, applied to a broker to raise £200 on his bill of exchange for that sum. Harris and Stratton, money dealers, on hearing of this, sent their broker to inquire whether Waller, the borrower, wanted money. The broker said his principal would advance half in money and half in goods, but that the goods should be choice sorts, and he should not lose by them. Waller’s broker informed him of this, and he went the next day to Harris and Stratton’s warehouse. They apologized for not having the money ready, saying they had only goods, and asked him to wait a few days. In the course of a few weeks, after many evasions, Harris and Stratton told the broker, if he would come the next day they would give him £50, and Waller accordingly went the next day. They still, however, evaded furnishing the money and offered goods, which Waller finally agreed to take, and goods were assorted and delivered. At the *161 same time the bill of exchange was delivered to Harris and Stratton, and also an assignment of Waller’s salary as a collateral security in case the bill should not be paid. The goods were worth but £120, which was paid to Waller by an auctioneer to whom they were delivered to be sold, and they finally netted £117. The question submitted to the jury was, whether the transaction was a loan of money for more than five per cent, under color of a sale of goods ; and they found a verdict for the defendant. This was under the direction of Lord Mansfield, who stated to the jury, that it appeared not to have been the intention of the parties to buy and sell, but to borrow and lend, and that the contract was in truth for a loan of money, though under the mask of a treaty for the sale of goods. A case was made for the opinion of the court, and Dunning and Morgan contended, as was contended here, that the transaction was really a sale of goods, at an exorbitant and iniquitous price, but still only a sale, the price to be paid at a future day, and for which future payment the bill and the assignment of the salary were given as securities. But the court decided otherwise, and Lord Mansfield, in giving their opinion, says, “ the only question, in all cases like the present, is, what is the real substance of the transaction, not what is the color and form.” And he says, “ it is impossible to wink so hard as not to see that there was no idea between the parties of any thing but a loan of money.”
In the case of Hammett v. Yea, 1 Bos. & Pul. 151, Lord Chief Justice Eyre says, that “ whether more than £5 per cent, is intentionally taken upon any contract for such forbearance, is a mere question of fact for the consideration of the jury, and must always be collected from the whole of the transaction as it passes between the parties.” And further, he says, “ that it never can be determined that any particular fact constitutes or amounts to usury, till all the circumstances with which it was attended, have been taken into consideration.”
These opinions show that an express agreement for usury need not be proved, but may be inferred from facts which may have the appearance of a sale, and it i? the jury only *162 who have the right to strip the transaction of its covet.ng and establish its true character. Now here there having been a loan wanted, and talked of between the parties, a private conference between them, money advanced, security taken, notes delivered as part of the consideration, the borrower ignorant and in distress, no dealer in other men’s notes, the notes being worthless, I think the jury had sufficient ground to infer that the whole transaction was a loan upon wh'ch most unconscionable usury was intended ;to be taken, and that there was no sale of the notes. And although we may think the evidence would better have supported a verdict on the ground of fraud, we are not at liberty to interpose.[1]
Upon the other question arising out of the report, a majority of the Court think there is no ground for a new trial, although the answer given to the question put by the juror was unquestionably wrong. It made no part of the charge to the jury, and ought not to have been considered by them as having any influence on the questions they were to decide. It is difficult to conceive that it had any such influence, the point they had to consider being, whether there was a usurious loan or not. The question seems to imply that the juror thought it would be hard to deprive the plaintiff of the notes transferred to the deceased, if the jury should be satisfied that he could not recover upon the note sued. The answer given might have tended to remove this difficulty from his mind, and relieve the question before the juror from a weight which did not belong to it. But the principal ground of refusing a new trial is, that this question and *163 answer passed in the hearing of the counsel, they having an opportunity to get the mistake corrected, but not doing it. It is true this was a sudden transaction, and the counsel might not instantly have perceived the effect of the answer; but it would have been proper to have called the attention of the judge to this subject immediately, and probably a single word of objection from the counsel would have set the matter right, for the jury would have been called in and informed that an erroneous answer had been given to the question, or that it was a subject which they ought not to consider as having any bearing on the case.
It certainly will introduce much difficulty in trials, if; where a regular charge is given to the jury, not complained of by counsel, new trials should be granted on account of some sudden question put by a juror, which is as suddenly answered, no objection being made in season to correct the procedure, nor until the party finds the verdict is against him. No doubt many things are said by a judge in the course of a trial, which will not bear scrutiny, and which pass wholly without notice. It would be a bad practice to allow these- matters to be brought up some days after the cause is decided, as the ground of a new trial. Even when the jury returned their verdict, stating the ground upon which it was given, had there been any previous intimation that stress was laid upon this incident, the jury might, and probably would have been sent out again, with the mistake corrected. We think it would be going too far, in a case where legal and equitable justice appears to be done by the verdict, to grant a new trial on account of a mistake which did not probably, although it might possibly have operated upon the minds of some of the jury. In the case of Estwick v. Caillaud, 5 T. R. 425, Buller J. says, “ On an application for a new trial, the only question is, whether under all the circumstances of the case the verdict be or be not according to the justice of the case ; for though the judge may have made some little slip in his directions to the jury, yet if justice be done by the verdict, the court ought not to interfere and set it aside. If indeed the facts be doubtful, and the attention of the jury has been drawn from the consider *164 ation of them, that is a ground for a new trial; but if the facts be clear, and those facts have been laid before the jury, we ought not to grant a new trial in order to give the unsuccessful party the chance of obtaining another verdict, if the former verdict be agreeable to the equity and conscience of the case.” Now in the case before us, the facts from which the jury were to draw the inference, were clear ; there was no contradiction in the evidence, and it was all laid before the jury, and the verdict is agreeable to the equity and con science of the case; for admitting that the verdict should rather have been on the ground of fraud than of usury, which is the only foundation for complaint against the verdict, we think the evidence of the present plaintiff’s being either the agent of Learned, or having such knowledge of the circumstances of the note as would make the defence good against him, so strong, that the jury could not have got over it.
Considering,' however, that the blunder complained of was occasioned by my inattention, although I fully concur in the foregoing opinion, I should have been in favor of a new trial, if my voice would have decided the question ; but as that would not have produced a majority for a new trial, I can only express my regret at the circumstance which took place, at the same time feeling entire satisfaction that it has been the cause of no injustice.[1]

Judgment according to the verdict.

 Bank of the United States v. Owens, 2 Peters, 527; Scott v. Lloyd, 9 Peters, 418; Van Shaack v. Stafford, 12 Pick. 565. The point upon which the law puts transactions of this sort is the quo animo of the parties. The corrupt agreement is the ground and foundation of all usurious contracts. Bank of the United States v. Waggener, 9 Peters, 400, 401; Murray v. Harding, 2 W. Bl. 859; Floyer v. Williams, Cowper, 112; Doe v. Gooch, 3 Barn. & Ald. 664; Solarte v. Melville, 7 Barn. & Cressw. 431; Lloyd v. Scott, 4 Peters, 224; Agricultural Bank v. Bissell, 12 Pick. 586. If the usury is exposed on the face of the instrument securing the usurious interest, res ipsa loquitur; — if it does not so appear, the jury alone have the right to investigate and judge of the nature of the transaction. Scott v. Lloyd, 9 Peters, 445; Massa v. Dauling, 2 Str. 1243; Ord on Usury, 208. See Thomas v Catheral, 5 Gill & Johns. 23.

 See Twigg v. Potts, 1 Crompt., Mees. & Roscoe, 89; Ingraham v. S. C. Ins. Co. 2 Const. R. 707; Copeland v. Wadleigh, 7 Greenl 140. Where the presiding judge has charged the jury under a misapprehension as to a material feet, a new trial will be awarded. Johnson v. Harth, 1 Bailey, 482.